UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 24-CR-198 (PP)

LAKIA JACKSON,

Defendant.

---

## PLEA AGREEMENT

---

1.     The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Kate M. Biebel and Julie F. Stewart, Assistant United States Attorneys, and the defendant, Lakia Jackson, individually and by attorney Robert LeBell, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in an twenty-count indictment, which alleges, in counts one through twelve, violations of Title 18, United States Code, Sections 1347 (health care fraud); in counts thirteen and fourteen, violations of Title 18, United States Code, Section 1028A(a)(1) (aggravated identity theft); in counts fifteen and sixteen, violations of Title 18, United States Code, Section 1035(a)(2) (false statements relating to health care matters); in counts seventeen and eighteen, violations of Title 18, United States Code, Section 1320a-7b(b)(2)(B); and in counts nineteen and twenty, violations of Title 18, United States Code, Section 1957 (engaging in unlawful monetary transactions).

1

3.     The defendant has read and fully understands the charges contained in the indictment. She fully understands the nature and elements of the crimes with which she has been charged. The charges and the terms and conditions of the plea agreement have been fully explained to her by her attorney.

4.     The defendant voluntarily agrees to plead guilty to counts one and thirteen of the indictment, set forth in full in Exhibit A.

5.     The defendant acknowledges, understands, and agrees that she is, in fact, guilty of the offenses described in Exhibit A. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish her guilt beyond a reasonable doubt:

> In March 2020, Jackson opened a prenatal-and-childcare coordination agency called We Care Services (WCS). WCS was supposed to provide Prenatal Care Coordination (PNCC) and Childcare Coordination (CCC) services in compliance with the ForwardHealth rules and regulations as set forth the Wisconsin State statutes and administrative code, and in the ForwardHealth Online Handbook. When she opened WCS, Jackson signed the Wisconsin Medicaid Provider Agreement. In that Agreement, Jackson agreed to submit only accurate and truthful claims that complied with the terms of the PNCC and CCC Online Handbooks published by ForwardHealth. Jackson also agreed that she would not offer or pay any kickbacks or renumeration in exchange for referrals to services covered by Medicaid. After opening her agency, Jackson immediately violated those promises and engaged in a scheme to defraud Wisconsin Medicaid for her own personal gain.

> As part of the scheme, Jackson advertised WCS on Facebook and in the community. Those mass marketing advertisements offered women baby-related items and cash in exchange for their identifying information, including their names and Medicaid identification numbers. Jackson also hosted "community baby showers" at which she gave out baby-related items in exchange for the identifying information of pregnant women and women with young children. Jackson then used the identifying information she obtained during community baby showers or on Facebook to "enroll" women into WCS's program and to bill for services she purportedly provided to those members. Jackson did not actually provide the services for which she billed.

> Instead, after Jackson induced women to provide their names and Medicaid numbers with the promise of free baby items, Jackson submitted bills to Medicaid that falsely

claimed that these women had been provided services pursuant to the PNCC and CCC rules. Many of these claims were entirely false and fraudulent because they asserted that Jackson or her employees provided services to the women months before she or an employee ever met or interacted with them. Jackson submitted these back-dated claims using the means of identification of other people without lawful authority during and in relation to her commission of health care fraud. All of the back-dated claims were false in that they claimed that Jackson or her employees provided services to women when, in fact, no services were provided to those women. For some members, Jackson submitted more than 50 claims for payment that predated a member's enrollment and pre-dated Jackson's or her employees' first meeting with the member. When Jackson submitted these back-dated claims, she knew that neither she nor any of her employees had provided any services to the member, knew that the claims were false, knew that she was not entitled to the payment she sought, and knew that the women had not authorized her to use their names and Medicaid numbers to submit bills to Medicaid for services she and her employees never provided on dates before the member first had contact with WCS.

Even for claims submitted after a woman's enrollment with WCS, it was Jackson's practice to submit claims that falsely asserted that either she or her employees spent two hours per visit providing services to a member even though Jackson knew that neither she nor any employee had provided two hours of covered services. Nearly all, 99.86%, of Jackson's CCC ongoing coordination claims were submitted for two-hour increments. In fact, none, or nearly none, of the interactions between a member and Jackson or Jackson's employees involved the provision of two hours of covered services. Jackson also routinely submitted claims for payment asserting that she, or her employees, spent the maximum allowable time per month (ten hours) providing CCC services to a member even though Jackson knew that neither she, nor her employees, provided ten hours of services. In fact, in many instances, Jackson submitted bills for the maximum allowable time even though no covered services were provided at all.

For a majority of the members she enrolled in the WCS program, Jackson and her employees provided nothing more than a monthly delivery of diapers and wipes—an incentive to keep the member signed up with her company, so she could continue to submit bills to Medicaid on the member's behalf. Jackson knew that directly supplying diapers and wipes, or other baby-related items, was not a covered service for which she could bill Medicaid. Despite that, Jackson willfully and knowingly submitted bills to Medicaid falsely asserting that she or an employee provided covered services, completely fabricating details about what she or her employees did for the members for whom she submitted bills. Jackson was consequently paid by Medicaid for providing services she knew she and her employees did not provide. Jackson used the money she received from these false billings to buy expensive items for herself and her family, including all of the properties listed in the forfeiture notice of the indictment, and other expensive vehicles, expensive vacations, a restaurant franchise, and a house. Jackson spent only a small fraction of the money she received from Medicaid to purchase items for the members she had fraudulently induced to enroll in WCS.

3

Jackson trained her employees—care coordinators—in how to carry out her scheme. She told them that they were supposed to spend a portion of their paychecks to buy items for "clients" even though she knew that Medicaid did not allow providers to fund the provision of uncovered services (such as giving out baby supplies) by billing for covered services they did not provide. Jackson instructed coordinators to falsify their billing records (progress notes) so that the narratives described covered services that were not actually provided. Jackson told her employees they had to do this because the state would not pay them for what they were actually doing—delivering diapers and wipes. Jackson also instructed her coordinators to submit progress notes that would be used to bill Medicaid for time periods that preceded a member's enrollment, *i.e.,* back-dating. And Jackson instructed her coordinators to always indicate in their progress notes that they spent two hours during each visit with a client, regardless of how much time they actually spent with their clients. Jackson knew, at the time she provided these instructions, that all of these actions were prohibited by the program rules and the Medicaid Provider Agreement she signed.

With respect to Member D.M., Jackson submitted a claim to Medicaid on June 30, 2021. That claim falsely asserted that Jackson provided two hours of CCC covered services to D.M. on sixty occasions between June 23, 2020 and June 7, 2021. When Jackson submitted that claim, Jackson knew that it was false and fraudulent because Jackson and D.M. first discussed D.M. enrolling in WCS's program on June 7, 2021, nearly a year after the first purported date-of-service of June 23, 2020. D.M. was, therefore, not enrolled in the WCS program on any of the dates between June 23, 2020, and June 7, 2021, did not receive any covered services on those days, and could not have legally authorized Jackson to use her identification to bill Medicaid for services she did not receive months earlier. Jackson submitted that claim with the intent to defraud Wisconsin Medicaid knowing that the claim related to the delivery of health care benefits and services and that Wisconsin Medicaid would find the fact that the claim was false to be material. She could not have convinced Medicaid to pay her claim had she not used the identifying information of a person qualified to receive the services she claimed, falsely, to have provided. To qualify for PNCC or CCC services, a person must be a real person who is enrolled in Wisconsin Medicaid, who is pregnant (for PNCC services) or has a young child (for CCC services), and who scores highly enough on either the PNCC or CCC risk-factor assessment questionnaire.

Between March 2020 and December 2021, Jackson billed Medicaid $3,782,808.04. She was paid $3,020,212.30 as part of the scheme. Throughout the scheme, Jackson was aware that the PNCC and CCC benefit was intended to fund the provision of prenatal care coordination and childcare coordination services that would improve birth outcomes for babies of at-risk mothers. Jackson was aware that the money she was stealing from the program was supposed to be used to help pregnant women and young mothers find resources related prenatal medical care, mental healthcare, and improved parenting.

In signing this agreement, Jackson acknowledges that by committing this fraudulent scheme she enriched herself at the expense of the community that she was supposed to be helping, and that she thereby reduced the resources available to mothers and babies

4

at risk for negative birth outcomes, including infant death.

## PENALTIES

6.       The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines: as to count one, 20 years of imprisonment and a $250,000 fine, and as to count thirteen, a two-year mandatory period of imprisonment. Each count also carries a mandatory special assessment of $100, and count one carries a maximum of three years of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 28 of this agreement.

7.       The defendant acknowledges, understands, and agrees that she has discussed the relevant statutes as well as the applicable sentencing guidelines with her attorney.

## DISMISSAL OF REMAINING COUNTS OF THE INDICTMENT

8.       The government agrees to move to dismiss the remaining counts of the indictment at the time of sentencing.

## ELEMENTS

9.       The parties understand and agree that in order to sustain the charge of health care fraud as set forth in count one, the government must prove each of the following propositions beyond a reasonable doubt:

First, there was a scheme to defraud a health care benefit program, as charged in the indictment; and

Second, the defendant knowingly and willfully carried out and attempted to carry out the scheme; and

Third, the defendant acted with the intent to defraud the health care benefit program; and

5

Fourth, the scheme involved a materially false or fraudulent pretense, representation, or promise; and

Fifth, the scheme was in connection with the delivery of or payment for health care benefits, health care items, and health care services.

The parties understand and agree that in order to sustain the charge of aggravated identity theft, as set forth in count thirteen, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant committed the felony offense of health care fraud;

Second, during and in relation to the healthcare fraud, the defendant knowingly transferred, possessed, or used a means of identification; and

Third, the defendant did so without lawful authority.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The defendant acknowledges and agrees that her attorney has discussed the applicable sentencing guidelines provisions with her to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal

6

history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1).

## Specific Offense Characteristics

17.     The parties agree to recommend to the sentencing court that a 16-level increase for loss in excess of $1,500,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(J), a 2-level increase for mass marketing under Sentencing Guidelines Manual 2B1.1(b)(2), and a 2-

7

level increase for loss to a government program in excess of $1,000,000 under 2B1.1(b)(7)(B) are applicable to the offense level for the offense charged in count one.

### Role in the Offense

18.     Pursuant to Sentencing Guidelines Manual § 3B1.1, the parties agree to recommend to the sentencing court that a 3-level increase be given for an aggravating role in the offense, as the defendant was a supervisor or manager.

### Acceptance of Responsibility

19.     The government agrees to recommend a 2-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), and to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b), but only if the defendant exhibits conduct consistent with those provisions.

### Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.     The Government agrees to recommend a sentence of no more than 36 months' incarceration on count one, to run consecutive to the 24 months' incarceration on count two, for a total maximum recommendation of 60 months' incarceration.

### Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing

8

court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation

9

required by the form. The defendant further agrees, upon request of FLP whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

## Special Assessment

27. The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

## Restitution

28. The defendant agrees to pay restitution in the amount of $2,655,463.63. The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

29. The defendant agrees that all properties listed in the indictment constitute the proceeds of the offenses to which she is pleading guilty, or were used to facilitate such offenses. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that she has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S WAIVER OF RIGHTS

30. In entering this agreement, the defendant acknowledges and understands that she surrenders any claims she may have raised in any pretrial motion, except that the defendant

retains the right to raise, on appeal, the issues she raised in her Motion to Dismiss Counts Thirteen and Fourteen of the Indictment, found at Dkt Nos. 19 and 20. The defendant also acknowledges and understands that she surrenders certain rights which include the following:

a. If the defendant persisted in a plea of not guilty to the charges against her, she would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and her attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and she would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on her own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that she could decline to testify and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify on her own behalf.

31. The defendant acknowledges and understands that by pleading guilty she is waiving all the rights set forth above. The defendant further acknowledges the fact that her attorney has explained these rights to her and the consequences of her waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may

11

question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32. The defendant acknowledges and understands that she will be adjudicated guilty of the offenses to which she will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33. The defendant knowingly and voluntarily waives all claims she may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

34. Based on the government's concessions in this agreement, the defendant, with the exception noted above in paragraph 30, knowingly and voluntarily waives her right to appeal her conviction or sentence in this case and further waives her right to challenge her conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statute or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statute or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction

12

motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

### Further Civil or Administrative Action

35.     The defendant acknowledges, understands, and agrees that the defendant has discussed with her attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### MISCELLANEOUS MATTERS

36.     The defendant agrees not to work for, or operate, any business which submits bills to government health care programs for a period of five years from the date of the defendant's release from any custodial sentence ordered in this case.

37.     The defendant agrees not to work as a tax preparer on behalf of third parties for a period of five years from the date of the defendant's release from any custodial sentence ordered in this case.

### GENERAL MATTERS

38.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

39.     The parties acknowledge, understand, and agree that this plea agreement will be

13

filed and become part of the public record in this case.

40.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

41.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Further Action by Internal Revenue Service

42.     Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

43.     The defendant agrees to transmit her original records, or copies thereof, to the Examination Division of the Internal Revenue Service so that the Examination Division of the Internal Revenue Service can complete its civil audit of the defendant. The defendant agrees to provide any additional books and records of her which may be helpful to the Examination Division of the Internal Revenue Service to complete its civil audit of defendant.

### EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

44.     The defendant acknowledges and understands if she violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. Alternatively, the government may, in its discretion, ask the court to be released

14

from specific obligations under this plea agreement to reflect the defendant's conduct if the defendant commits a federal, state, or local offense punishable by a term of imprisonment exceeding one year or violates a material term of the plea agreement. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of her breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and her attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that she continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

45.     The defendant acknowledges, understands, and agrees that she will plead guilty freely and voluntarily because she is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 11/04/2025

LAKIA JACKSON
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 11/4/25

ROBERT LEBELL
Attorney for Defendant

For the United States of America:

Date: 11/4/25

for RICHARD G. FROHLING
Acting United States Attorney

Date: 11/4/2025

JULIE F. STEWART
KATE M. BIEBEL
Assistant United States Attorneys

16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

               Plaintiff,

       v.                         Case No. 24-CR-198 (PP)

LAKIA JACKSON,               [18 U.S.C. §§ 1028A(a)(1), 1035, 1347, 2(a) & 1957; 42 U.S.C. § 1320a-7b(b)]

               Defendant.

---

**INDICTMENT**

---

**THE GRAND JURY CHARGES THAT:**

1.     At all times material to this indictment:

     a.     Defendant LAKIA JACKSON owned and operated We Care Services ("WCS").

     b.     WCS was a Prenatal Care Coordination ("PNCC") and Childcare Coordination ("CCC") company, which billed Wisconsin Medicaid ("Medicaid") for services purportedly provided to pregnant women and mothers in Milwaukee, Wisconsin.

<u>The Wisconsin Medicaid Program</u>

     c.     Medicaid was a program jointly funded by the federal government and participating states to provide health insurance to indigent families with dependent children and to aged, blind, and disabled individuals whose income and resources are insufficient to meet the cost of medical services. 42 U.S.C. §§ 1396, et seq. (the "Medicaid Act").

     d.     Wisconsin participates in the Medicaid program ("Wisconsin Medicaid"). In Wisconsin, the Medicaid program was established pursuant to Wisconsin Statutes Chapter 49 and its administrative regulations. The United States pays for a portion of the

program.

e.     To participate in the Medicaid program, a provider must enter into a written Medicaid Provider Agreement (the "Provider Agreement") with the Wisconsin Department of Health Services in which the provider certifies that every claim submitted is truthful and that the services billed have been furnished in accordance with state and federal law. The Provider Agreement also requires a certification that the provider has not offered, paid, or received anything of value in return for the referral or provision of Medicaid-covered services.

f.     The Medicaid Provider Agreement detailed that the provider would be governed by the rules and regulations set forth in the ForwardHealth Online Handbook ("Handbook").

g.     The PNCC and CCC benefits were governed by rules and regulations set forth in the Handbook and updates issued through the ForwardHealth Portal at www.forwardhealth.wi.gov.

### The PNCC Benefit and PNCC Handbook

h.     The PNCC benefit is intended "to improve birth outcomes among women who are deemed at high risk for poor birth outcomes."

i.     The benefit was created, in part, because Wisconsin has historically had the highest rate of infant mortality for African Americans in the nation.

j.     PNCC services are supposed to ensure that women at high risk: (1) are identified as early as possible in their pregnancy; (2) receive individual psychosocial support and services; (3) receive early and continuous prenatal care services; (4) receive necessary health and nutrition education; (5) are referred to available community services, as appropriate; and (6) receive assistance in accessing and obtaining needed health and

2

social services.

k.  PNCC service providers were required to bill only for services actually provided and only for the actual time spent providing covered services.

The CCC Benefit and CCC Handbook

l.  The CCC benefit was added as an extension of the PNCC benefit. Its purpose was to "promote positive parenting, improve child health outcomes, and prevent child abuse and neglect."

m.  The benefit explicitly did not cover direct services.

n.  CCC service providers were supposed to focus on: (1) improving family functioning; (2) improving parenting skills and positive parenting outcomes; (3) increasing members' understanding of infant and child development; (4) increasing members' access to and appropriate use of the health care delivery system; (5) improving employment outcomes; (6) encouraging planned pregnancies; and (7) improving future birth outcomes.

**The Scheme**

2.  Beginning by at least June 2020, and continuing through December 2021, in the State and Eastern District of Wisconsin and elsewhere,

**LAKIA JACKSON**

knowingly and willfully executed and attempted to execute a scheme to defraud a health care benefit program, namely Wisconsin Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of such program, in connection with the delivery of and payment for health care benefits, items, and services.

3.  JACKSON executed the scheme in the following ways:

a.  As part of the scheme, JACKSON advertised on Facebook, and in the

3

community, for pregnant and new mothers to enroll in WCS's PNCC and CCC program. JACKSON used these advertisements to unlawfully bribe or induce women to enroll by offering free baby supplies such as diapers, wipes, and cash.

      b.     As part of the scheme, JACKSON hosted "community baby showers" during which women would be given free baby items such as car seats, pack & plays, and diapers in exchange for enrolling in the program.

      c.     As further part of the scheme, JACKSON directed her employees to provide supplies to the enrolled member.

      d.     JACKSON incentivized her employees to inflate their billings to Wisconsin Medicaid by tying their compensation to the amount WCS billed Wisconsin Medicaid.

      e.     JACKSON instructed her employees to falsify billing submissions to Wisconsin Medicaid by knowingly misstating the duration, frequency, date, and nature of the services provided.

      f.     JACKSON, and other individuals she directed and controlled, submitted claims for payment to Medicaid based on false and fraudulent statements, including for services never rendered.

      g.     JACKSON, and other individuals she directed and controlled, submitted claims for payment to Medicaid for dates that preceded the date on which the client met a representative of WCS or enrolled in the program.

4.     As part of this scheme, JACKSON submitted and caused to be submitted bills totaling over $3,700,000, which contained false and fraudulent statements, and which caused Wisconsin Medicaid to pay her over $3,000,000 to which she was not entitled.

4

## COUNT ONE
(Health Care Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

5.       On or about the dates set forth below, in State and Eastern District of Wisconsin and elsewhere,

### LAKIA JACKSON,

for the purpose of executing the scheme described above, and in connection with the delivery of and payment for health care benefits, items, and services, knowingly and willfully submitted and caused the submission of the following materially false and fraudulent claims on the dates below, which falsely represented the nature of the provider's interaction with the member indicated below, falsely represented that covered services were provided, and falsely represented the amount of time spent providing covered services, which caused payments in the following amounts:

| Count | Service Dates | Billed Date | Member | Amount Billed | Amount Paid |
|-------|---------------|-------------|--------|---------------|-------------|
| 1 | 6/23/20 to 6/7/21 | 6/30/21 | D.M. | $5,760 | $5,188.80 |

Each in violation of Title 18, United States Code, Sections 1347 and 2(a).

5

## COUNT THIRTEEN
(Aggravated Identity Theft)

**THE GRAND JURY FURTHER CHARGES THAT:**

6.     On or about June 30, 2021, in the State and Eastern District of Wisconsin,

**LAKIA JACKSON**

knowingly possessed and used, without lawful authority, a means of identification of another person, specifically the name, date of birth, and Wisconsin Medicaid ID number of D.M., during and in relation to the felony offense of health care fraud, in violation of 18 U.S.C. § 1347, as charged in Count One of this Indictment, knowing that the means of identification belonged to another actual person and that D.M. had not enrolled as a client of Jackson's program and had not received any covered services between June 30, 2020, and June 7, 2021.

In violation of Title 18, United States Code, Section 1028A(a)(1).